# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 11, 2008          Decided July 18, 2008

No. 07-5101

KATHY E. ADAMS,
APPELLANT

v.

CONDOLEEZZA RICE, SECRETARY OF STATE,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 05cv00941)

---

*Ellen K. Renaud* argued the cause for appellant. With her on the briefs was *David H. Shapiro*. *Richard L. Swick* entered an appearance.

*Daniel B. Kohrman* and *Melvin Radowitz* were on the brief for *amici curiae* American Association of Retired Persons and American Cancer Society in support of appellant.

*John C. Truong*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: HENDERSON, TATEL, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

TATEL, *Circuit Judge*: Appellant Kathy Adams, a candidate for the United States Foreign Service, passed the required entrance examinations and received a medical clearance, only to learn thereafter that she had been diagnosed with stage-one breast cancer. Upon hearing the news, the State Department, expressing concern that many of its overseas posts lack the follow-up care it believed Adams required, revoked her medical clearance, disqualifying her from the Foreign Service. Adams sued under the Rehabilitation Act of 1973, which prohibits federal agencies from discriminating in employment against disabled individuals—including those with a "record of" a disability, 29 U.S.C. § 705(20)(B)(ii). In her complaint, she alleged that her surgical treatment rendered her cancer-free and able to work anywhere in the world without requiring specialized follow-up care. Without allowing discovery, the district court granted summary judgment to the State Department, concluding among other things that Adams had no record of a disability as defined in the statute. For the reasons set forth in this opinion, we reverse.

## I.

Viewed in the light most favorable to Adams, the evidence tells the following story. *See Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (explaining standard of review on summary judgment).

The Foreign Service, an arm of the State Department, requires its officers to be "available to serve in assignments throughout the world," 22 U.S.C. § 3901(a)(4), and frequently assigns junior Foreign Service officers to overseas locations that—due to factors such as "unreliable air service, poor or non-existent medical facilities, and unreliable postal or other delivery systems"—are considered "hardship posts." John M. O'Keefe Decl. ¶ 3; s*ee generally Taylor v. Rice*, 451 F.3d 898, 900-01 (D.C. Cir. 2006) (explaining Foreign Service hiring requirements and assignment procedures). Candidates who pass the Foreign Service's rigorous written and oral examinations receive conditional offers of employment, requiring, among other things, that they "receive a medical examination and be issued a medical clearance." 3 U.S. DEP'T OF STATE, FOREIGN AFFAIRS MANUAL ("FAM") § 1931.1(b) (2002); *see also* 22 C.F.R § 11.1 (establishing Foreign Service testing and application procedures). The State Department's Office of Medical Services ("MED") performs the required medical examinations and issues "Class 1" clearances to examinees "who have no identifiable medical conditions that would limit assignment abroad." 3 FAM § 1931.3-1(1). The State Department refers to Class 1-approved candidates as "worldwide available." *Taylor*, 451 F.3d at 901. Those failing to obtain such clearances automatically receive "Class 5" clearances, 3 FAM § 1931.1(b), meaning they "have a medical condition which is incapacitating or for which necessary specialized medical care is best obtained in the United States," *id.* § 1931.3-1(3). Because individuals with Class 5 clearances are deemed unable to serve safely outside the United States, they are declined appointments to the Foreign Service unless they request and receive an administrative waiver of the medical standards for employment. Such waivers result in a "Class 2" clearance, meaning the applicant "can be treated adequately at some but not all posts outside the United States." Bruce L.

Cole Decl. ¶ 7; *see also* 3 FAM § 1931.3-1(2). Rarely granted, waivers are issued on the basis of factors such as the extent of worldwide availability and extraordinary skills possessed by the applicant.

Appellant Kathy Adams applied to the Foreign Service and by April 2003 had passed both the written and oral examinations. In July, after undergoing the required medical screening, Adams learned that she had received a Class 1 unlimited medical clearance for worldwide assignment. In mid-August, however, Adams was diagnosed with stage-one breast cancer.

After discussing treatment options with her physicians, Adams elected to undergo a mastectomy and simultaneous reconstructive surgery, reasoning that it "would provide the best option for me to be able to resume my normal life activities." Adams Decl. ¶ 10. The surgery took place in mid-September. According to Adams, after the procedure she "could not work at all" for three weeks, "was unable to perform household chores for several weeks," and "was unable to care for [her]self properly and . . . drive for about two weeks." *Id.* ¶ 12. Two months later, as part of her breast cancer treatment, Adams had her ovaries and fallopian tubes removed, a procedure necessitating an additional week of recovery.

As Adams grappled with her medical diagnosis and treatment, the State Department continued processing her application. In late September it sent Adams her final security clearance indicating that she was "eligible for appointment to the Foreign Service" and had "been added to the Consular register of those awaiting appointment." Letter from Patricia Evans, Human Resources Specialist, Bd. of Exam'rs for the Foreign Serv. to Kathy Adams (Sept. 25,

2003). After receiving this letter on October 2, Adams learned from State Department human resources official Patricia Evans that she was ranked seventh out of 200 consular candidates due to her high score on the Foreign Service Examination. Evans told Adams that "barring some unforeseeable catastrophe," she would receive an appointment to the Foreign Service beginning in January 2004. Adams Decl. ¶ 15; Patricia Evans Decl. at 2.

The next day, Adams told the State Department about her breast cancer diagnosis. Upon learning this information, MED nurse Rebecca Forsman asked Adams for a "typed summary report from your primary treating physician" that included pathology reports, blood-work results, a summary of care, and a "[t]reatment plan detailing the type and frequency of follow-up care/monitoring needed." Email from Rebecca Forsman to Kathy Adams (Oct. 10, 2003). Forsman warned Adams "that there is a significant possibility that we will not be able to re-issue a Class One (worldwide available) medical clearance in the near future," but assured her that "once all of the MD documentation has been received, the providers here will review this carefully." *Id.* In a telephone conversation, Adams recalls, "Ms. Forsman remarked that it would be in my best interest to remain in the United States . . . after an occurrence of breast cancer, rather than to join the Foreign Service and live outside the U.S." Adams Decl. ¶ 24.

Responding to the State Department's request for information, Adams had her primary physician, Doctor Mark A. O'Rourke, send a letter to the State Department explaining that she had been successfully treated for early stage breast cancer and was "in completed remission with an excellent prognosis." Letter from Dr. Mark A. O'Rourke 1 (Nov. 19, 2003). According to Dr. O'Rourke, Adams was "cancer-free," had "no job limitations whatsoever," could "undertake

a full schedule of work, travel, and vigorous sports," and was "entirely able to work overseas for long periods of time." *Id.* at 1-2. As for follow-up care, Adams needed one pill per day of Tamoxifen (an anti-estrogen drug), an annual mammogram (recommended for all women Adams's age), and—crucially for this case—a "clinical breast exam at 6-month intervals for the next 5 years." *Id.* at 1. Adams, he concluded, "is a remarkable individual with excellent health, high energy, determination, and enthusiasm. I can say with complete confidence that this history of breast cancer will not slow her down one bit at all." *Id.* at 2.

After reviewing the submitted materials, MED informed Adams in mid-December that she was no longer "worldwide available" and issued her a Class 5 clearance. Explaining this decision, MED Director Laurence Brown later stated that Adams "disclosed to MED . . . that she had been diagnosed with Stage 1 breast cancer and had undergone an operation in August 2003," and that "[o]n that basis, MED determined that she was not eligible for service worldwide." Brown Decl. ¶ 14. Specifically, MED based its decision on its conclusion that "the Department could not guarantee . . . [Adams] access to the required medical follow-up and surveillance for her condition . . . at all overseas assignments" since only 53% of all Foreign Service posts had "surgeons and/or oncologists" available to perform a semi-annual breast exam. *Id.* ¶ 18. Echoing this rationale, MED nurse Forsman explained that "[t]he problem was that [Adams] needed to be seen every six months for follow-up care (preferably by a specialist)." Forsman Decl. at 3.

Attempting to salvage her candidacy, Adams sought an administrative waiver from MED. In support, Dr. O'Rourke sent another letter emphatically endorsing Adams's ability to work "*anywhere* in the world for prolonged periods of time."

Letter from Dr. Mark A. O'Rourke to Dep't of State Bd. of Exam'rs for the Foreign Serv. ¶ 7 (Jan. 12, 2004). The letter also clarified that "any competent physician [could] perform [Adams]'s examinations; an oncologist or other specialist is not required," and that a nurse practitioner "would be competent to perform" the bi-annual breast exams "if a physician were not conveniently available." *Id.* ¶¶ 9, 14; *see also* O'Rourke Supp. Decl. ¶ 5. Another oncologist, Doctor Kimberly Blackwell of Duke University Breast Cancer Center, concurred with Dr. O'Rourke's assessment of Adams's follow-up care needs.

MED denied the waiver request. Despite Dr. O'Rourke's assurance that Adams required no medical specialists to provide any of her follow-up care, the MED doctor who denied the waiver confirmed that in MED's view only "53% of all Foreign Service posts have the professional and technological support required in this case." Memorandum from Emil Von Arx III, Medical Advisor to Employee Review Comm. (Mar. 23, 2004). Left holding a Class 5 medical clearance, Adams was denied entry into the Foreign Service.

Adams filed an Equal Employment Opportunity (EEO) complaint in July 2004 claiming discrimination on the basis of a physical disability, namely her history of "Stage 1 breast cancer." Formal Compl. of Discrimination (July 22, 2004). According to her complaint, Adams had "resumed all physical activities," and "require[d] only one extra check-up per year for four more years and tamoxifen," a drug that thanks to its long shelf life could be "readily store[d] at post." *Id.* The EEOC initiated an investigation, but after Adams filed suit in the U.S. District Court for the District of Columbia in May 2005, the Commission dismissed Adams's administrative complaint and terminated the EEO process.

*See* 29 C.F.R. § 1614.107(a)(3) (instructing EEOC to dismiss complaint when complainant has filed a civil action in federal district court more than 180 days after filing administrative complaint).

In her amended complaint, Adams alleges that the Department discriminated against her because of a disability, i.e., breast cancer.  The State Department responded with a motion to dismiss, or in the alternative, for summary judgment.  Noting that "[n]o discovery has taken place, but both parties have submitted declarations and other forms of documentary evidence to support their positions," the district court treated the Department's motion as one for summary judgment and granted it. *Adams v. Rice*, 484 F. Supp. 2d 15, 19 (D.D.C. 2007).  Although the district court found the State Department's "refusal to accept the recommendations of [Adams]'s physicians or otherwise accommodate her minor medical needs . . . both callous and unreasonable," it nonetheless concluded that Adams had failed to show she had a disability as defined in the Act.  *Id.* at 23-24.

Adams now appeals, and the American Cancer Society and AARP filed an amicus brief on her behalf.  We review the district court's ruling de novo, drawing all reasonable inferences from the evidence in Adams's favor and without making credibility determinations or weighing the evidence. *See Czekalski*, 475 F.3d at 362-63.

## II.

Rehabilitation Act section 501 prohibits federal agencies from engaging in employment discrimination against disabled individuals.  29 U.S.C. § 791(b); *see also Taylor*, 451 F.3d at 905 & n.11 (explaining that section 501(b) provides a private cause of action for claims alleging employment discrimination); 22 U.S.C. § 3905(e)(4) (expressly applying

section 501's prohibition on "discrimination on the basis of handicapping condition" to the Foreign Service). This deceptively simple injunction against disability discrimination implicates an interlocking web of statutory definitions. First, although the Act includes no definition of "discrimination," it instructs courts to use the same standards employed in cases arising under the Americans with Disabilities Act (ADA). 29 U.S.C. § 791(g); *see also Breen v. Dep't of Transp.*, 282 F.3d 839, 841 (D.C. Cir. 2002) (applying ADA employment discrimination standards to Rehabilitation Act claim). Adams's claim therefore incorporates ADA section 102, which provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA also includes within the definition of "discriminate" the failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship." *Id.* § 12112(b)(5)(A); *see also* 29 C.F.R. § 1630.9(a).

Here, Adams alleges that the State Department denied her employment because of her status as a cancer survivor. She seeks no accommodation of any sort—indeed, her entire case rests on the proposition that she is "fit as a fiddle," Adams Decl. ¶ 47, and perfectly able to serve anywhere in the world no matter the conditions without requiring the services of medical specialists for follow-up care. *See* Pl.'s Mem. in Opp'n to Def.'s 2d Mot. to Dismiss or for Summ. J. 33 ("Ms.

Adams needs no accommodation to perform the duties of a foreign service officer.").

"Disability" is another term of art under the statute that carries a specific meaning. An individual is disabled under the Rehabilitation Act only if she can show that she (1) "has a physical or mental impairment which substantially limits one or more . . . major life activities," (2) "has a record of such an impairment," or (3) "is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). In other words, as the Supreme Court explained when interpreting nearly identical language in the ADA, "to fall within this definition one must have an actual disability . . . , have a record of a disability . . . , or be regarded as having one." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 478 (1999). Adams argues that she meets all three definitions, and we will examine each in turn.

Before doing so, we observe that all three disability definitions include a reference—central to this case—to a substantial limitation on a major life activity. To qualify as disabled, Adams must therefore do more than show that she has, had, or was regarded as having an impairment of some sort. Rather, she must show that her alleged impairment is, was, or was believed to be one that "substantially limits one or more . . . major life activities." 29 U.S.C. § 705(20)(B). In other words, the impairment must be one whose "severity is such" that it qualifies under the statutory definition. H.R. REP. NO. 101-485, pt. 2, at 52 (1990) (internal quotation marks omitted) (explaining definition of the term "disability" for purposes of the ADA); *see also Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 195 (2002) ("Merely having an impairment does not make one disabled for purposes of the [Act]. Claimants also need to demonstrate that the impairment limits a major life activity."). The Act nowhere defines the phrase "major life activity," but the Supreme

Court has explained that "the word 'major' denotes comparative importance and suggests that the touchstone for determining an activity's inclusion under the statutory rubric is its significance." *Bragdon v. Abbott*, 524 U.S. 624, 638 (1998) (alteration and internal quotation marks omitted); *see also Toyota*, 534 U.S. at 197 ("'Major' in the phrase 'major life activities' means important."). Accordingly, while "such basic abilities as walking, seeing, and hearing" easily qualify, *Toyota*, 534 U.S. at 197; *see also Desmond v. Mukasey*, No. 07-5139, Slip op. at 15-19 (D.C. Cir. 2008) (recognizing sleeping as a major life activity), activities that lack "central importance to most people's daily lives" will not satisfy the statute, *Toyota*, 534 U.S. at 198; *see also Singh v. George Washington Univ. Sch. of Med.*, 508 F.3d 1097, 1104 (D.C. Cir. 2007) (holding that test-taking is not a major life activity under the ADA). For reasons explained in greater detail below, *see infra* Part III, when the employee alleges pure discrimination on the basis of a disability the claimed limitation need have nothing to do with the employee's ability to work. By contrast, when an employee seeks a workplace accommodation, the "accommodation must be related to the limitation that rendered the person disabled." *Nuzum v. Ozark Auto. Distribs., Inc.*, 432 F.3d 839, 848 (8th Cir. 2005). The reason is this: as the ADA's legislative history makes clear, the substantial limitation and major life activity requirements act as statutory filters distinguishing those suffering from relatively serious impairments from those with "minor, trivial impairment[s]." H.R. REP. NO. 101-485, pt. 2, at 52 (explaining that under the ADA a person with "a simple infected finger is not impaired in a major life activity"). Accordingly, if Adams can show that her impairment substantially limited an activity qualifying as a "major life activity" under the Act—work-related or not—then she qualifies as disabled under the statute.

With this framework in mind, we turn to the sole issue before us: whether Adams qualifies as disabled under one or more of the Act's three disability definitions. Because we can easily dispose of Adams's arguments under two of those definitions, we address them first.

*Actual Disability*

Adams's first claim—that the State Department discriminated against her on the basis of "a physical or mental impairment which substantially limits one or more . . . major life activities," 29 U.S.C. § 705(20)(B)(i)—fails for an obvious reason: Adams's breast cancer—her only claimed impairment—was gone by the time the State Department made its allegedly discriminatory employment decisions. As the government points out, Adams's illness had been fully treated by November 2003, at which point her doctors pronounced her "cancer-free" and "in completed remission." Letter from Dr. Mark A. O'Rourke 1 (Nov. 19, 2003). She thus had no physical impairment either in December 2003 (when the State Department revoked her Class 1 medical clearance) or in March 2004 (when MED denied her waiver request). Dr. O'Rourke made the same point, explaining that Adams "does not have an active illness or condition" but must remain vigilant given her "*history* of breast cancer" in order to "detect a *return* of her cancer." O'Rourke Decl. ¶¶ 12-13 (emphases added). Accordingly, the State Department could not have discriminated against Adams "solely by reason of her . . . disability," 29 U.S.C. § 794(a), given that her "impairment" had already been eradicated. At oral argument, Adams's counsel suggested that the risk of cancer recurrence could itself constitute a physical impairment, but because Adams never made that allegation in the district court, *see Adams*, 484 F. Supp. 2d at 20 n.2, we will not consider it here. *See Flynn v. Comm'r*, 269 F.3d 1064, 1068-69 (D.C. Cir. 2001) (noting that, absent exceptional circumstances,

arguments not made to the district court are forfeited). And given that Adams had no impairment at the time the allegedly discriminatory actions took place, we need not decide whether she was substantially limited in a major life activity for purposes of the actual disability definition.

*"Regarded as" Having a Disability*

An individual is "regarded as" disabled if her employer "mistakenly believes that [the] person has a physical impairment that substantially limits one or more major life activities" or "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489. Although many circuits have recognized working as a major life activity, *see, e.g.*, *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 80 (2d Cir. 2000); *EEOC v. R. J. Gallagher Co.*, 181 F.3d 645, 654 (5th Cir. 1999), both the Supreme Court and this court have scrupulously avoided deciding whether working constitutes a major life activity for purposes of the Act. *See Sutton*, 527 U.S. at 492; *Gasser v. District of Columbia*, 442 F.3d 758, 763 n.7 (D.C. Cir. 2006) (noting "the difficulties the issue presents" (internal quotation marks omitted)). Instead, for purposes of analysis, we have assumed without deciding that working qualifies. *See Duncan* v. *WMATA*, 240 F.3d 1110, 1114 n.1 (D.C. Cir. 2001) (en banc).

Doing the same here, we reject Adams's claim. "[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523 (1999). Adams must therefore present enough evidence to persuade a reasonable jury that the State Department viewed her as "precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton*, 527 U.S. at 492. She failed to carry this burden.

Nothing in the record reveals that the State Department believed Adams was unable to hold any position other than that of Foreign Service officer—and even then, the Department thought her unable to serve only at certain "hardship posts" overseas. Adams argues that by denying her a Class 1 medical clearance the State Department revealed that it regarded her as unable to hold a host of other government jobs requiring similar clearances, but such an interpretation would mean that every Foreign Service candidate denied a Class 1 medical clearance would be disabled under the Rehabilitation Act. *See Thompson v. Rice*, 422 F. Supp. 2d 158, 175-76 (D.D.C. 2006). We decline to adopt such a broad reading of the statute.

### *"Record of" a Disability*

Seeking to "make clearer that the [Act's] coverage . . . extends to persons who have recovered—in whole or in part—from a handicapping condition, such as a mental or neurological illness, a heart attack, or cancer," S. REP. NO. 93-1297, at 38-39 (1974), Congress amended the Rehabilitation Act in 1974 to cover not only those individuals with impairments that substantially limit a major life activity, but also those having "*a record of* such an impairment," Pub. L. No. 93-516, § 111, 88 Stat. 1617, 1619 (now codified at 29 U.S.C. § 705(20)(B)(ii)) (emphasis added). The "record of" definition was tailor-made for plaintiffs who, like Adams, claim they once suffered from a physical or mental impairment that substantially limited a major life activity, recovered from the impairment, but nonetheless faced employment discrimination because of it. *See* 29 C.F.R. pt. 1630, app. § 1630.2(k) (explaining that the "record of" definition "protects former cancer patients from discrimination based on their prior medical history").

Our dissenting colleague seems to adopt a narrow reading of the term "record," suggesting that it refers only to tangible documentation of the plaintiff's impairment. *See* Dissenting Op. 6-7. But Department of Health and Human Services (HHS) regulations interpreting the Rehabilitation Act—which the Supreme Court has called a "particular[ly] significan[t]" source of guidance, *Toyota*, 534 U.S. at 195; *Bragdon*, 524 U.S. at 632—define the phrase "has a record of such an impairment" more broadly, namely "*has a history of*, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities," 45 C.F.R. § 84.3(j)(2)(iii) (emphasis added). Thus, although "record of" disability claims will often involve tangible documents of some kind, such as medical reports or employment forms detailing a previous medical condition, plaintiffs may satisfy the "record of" definition simply by showing that they "ha[ve] a history of" a qualifying impairment. *Id.* And just as a plaintiff may not qualify as disabled or regarded as disabled based on an illness alone— even a serious illness like cancer—evidence of a prior illness, without more, is insufficient to show a record of disability. Because the Act protects individuals having a "record of *such an impairment*," Adams must show that her alleged impairment "substantially limit[ed] one or more . . . major life activities." 29 U.S.C. § 705(20)(B) (emphasis added); *see Gallagher*, 181 F.3d at 655 ("[I]t is not enough for [a] . . . plaintiff to simply show that he has a record of a cancer diagnosis; in order to establish the existence of a "disability" . . . there must be a record of an impairment that substantially limits one or more of the . . . plaintiff's major life activities.").

Our inquiry under the "record of" definition therefore follows a three-step process. First, we ask if Adams has a history of a mental or physical impairment. If so, we ask whether the impairment limited an activity qualifying as a

major life activity under the Act. Finally, if both the impairment and activity pass muster under the statute, we ask whether the alleged limitation was substantial. We consider each of these issues in turn.

Here it is undisputed both that Adams has a history of breast cancer and that breast cancer qualifies as a "physical impairment" under the Act. Indeed, commentary accompanying the HHS regulations expressly names "cancer" as part of a "representative list of disorders and conditions constituting physical impairments." *Bragdon*, 524 U.S. at 633 (quoting 42 Fed. Reg. 22,676, 22,685 (1977)); *see also* 45 C.F.R § 84.3(j)(2)(i) (defining "impairment" as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine"). And because the government nowhere argues that breast cancer fails to qualify as an "impairment" under the Act, we will not belabor the point.

Having found that Adams has a history of an impairment, we next determine whether that impairment has limited any of her major life activities. Adams argues that it has in two ways. First, she contends that after her various surgeries—which required brief hospital stays—she "was unable to care for herself and unable to work." Appellant's Opening Br. 39. Under *Toyota*, however, "the impairment's impact must . . . be permanent or long term." 534 U.S. at 198; *see also Haynes v. Williams*, 392 F.3d 478, 483 & n.4 (D.C. Cir. 2004). Here, the evidence shows that Adams's difficulty caring for herself, working, performing household chores, and driving lasted for only several weeks following her surgeries. Assuming any or all of these activities qualify as major life

activities under the Act, we agree with the district court that because Adams's "recovery times . . . consisted only of several weeks," they were "hardly enough to qualify as . . . permanent or long-term." *Adams*, 484 F. Supp. 2d at 22; *see also Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999) ("A temporary inability to work while recuperating from surgery is not . . . a permanent or long-term impairment and does not constitute evidence of a disability covered by the Act.").

Adams's second argument is that her cancer substantially limited her in the major life activity of engaging in sexual relations. Adams alleges that although she remains cancer-free, has an "excellent prognosis," no longer requires ongoing cancer treatment, and "has no particular limits on her work activities," she remains "limited in the major life activity of sexual contact and romantic intimacy." Am. Compl. ¶ 12. According to Adams, her cancer treatment left a "residual effect . . . that may never resolve"—one that is "psychological in nature." Adams Decl. ¶ 48. She explains:

> Like many breast cancer survivors, whether by virtue of my discomfort with the way my body looks, loss of sensation after my surgeries, my deep-seated fear that prospective suitors will reject me because of my history of cancer, loss of a breast, and current physical appearance, or the side effects of medication that causes loss of libido, I now find that the prospect of dating and developing an intimate relationship is just too painful and frightening. While I have overcome the physical disease, my ability to enter into romantic relationships has been crippled indefinitely and perhaps permanently.

*Id.* ¶ 49.

This circuit has yet to decide whether sexual relations constitutes a major life activity for purposes of the Act. Arguing that it does, Adams relies on the Supreme Court's holding in *Bragdon v. Abbott* that human reproduction qualifies as a major life activity, *see* 524 U.S. at 638, and the government's brief presents no argument to the contrary. Based on the statute's text, the Supreme Court's reasoning in *Bragdon*, and a hefty dose of common sense, we hold that engaging in sexual relations qualifies as a major life activity under the Act.

Beginning with the statute, we can easily conclude without resorting to the dictionary that engaging in sexual relations clearly amounts to an "activity" in any sense of that word. As for the word "major," the Supreme Court has explained that "the touchstone for determining an activity's inclusion under the statutory rubric is its significance." *Id.* (internal quotation marks omitted). At the risk of stating the obvious, sex is unquestionably a significant human activity, one our species has been engaging in at least since the biblical injunction to "be fruitful and multiply." *Genesis* 1:28. As a basic physiological act practiced regularly by a vast portion of the population, a cornerstone of family and marital life, a conduit to emotional and spiritual fulfillment, and a crucial element in intimate relationships, sex easily qualifies as a "major" life activity.

*Bragdon* supports this self-evident conclusion. There the Supreme Court held that asymptomatic HIV constitutes a disability under the ADA because it is a physical impairment that substantially limits the major life activity of reproduction. 524 U.S. at 637-41. Our holding follows directly from *Bragdon*. In concluding that reproduction meets the statutory

definition, the *Bragdon* Court explained that "[r]eproduction *and the sexual dynamics surrounding it* are central to the life process itself." *Id.* at 638 (emphasis added). Furthermore, *Bragdon* explains that one of the ways in which HIV limits reproduction is by creating a risk that an infected individual will transmit the disease to another while engaging in sexual contact. *See id.* at 639. Finally, the Court placed special emphasis on an opinion issued by the Justice Department's Office of Legal Counsel (OLC) stating that "'[t]he life activity of engaging in sexual relations is threatened and probably substantially limited by the contagiousness of the virus.'" *Id.* at 643 (quoting Application of Section 504 of the Rehabilitation Act to HIV-Infected Individuals, 12 Op. Off. Legal Counsel 264, 274 (1988)). It bears mentioning that when Congress passed the ADA—a statute directly patterned on the Rehabilitation Act—it considered this same OLC opinion, explaining that HIV-infected individuals qualify as disabled "because of a substantial limitation to procreation *and intimate sexual relationships*." H.R. REP. NO. 101-485, pt. 2, at 52 (emphasis added); *see also* S. REP. NO. 101-116, at 22 (1989) (citing OLC opinion).

Based on this reasoning, many courts, including district courts in this circuit, have read *Bragdon* to imply that engaging in sexual relations qualifies as a major life activity. *See, e.g.*, *McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999); *Norden v. Samper*, 503 F. Supp. 2d 130, 151 (D.D.C. 2007); *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 298-99 (S.D.N.Y. 2003); *Powell v. City of Pittsfield*, 221 F. Supp. 2d 119, 146 (D. Mass. 2002). And in his separate *Bragdon* opinion, Chief Justice Rehnquist took a similarly pragmatic view of the Court's holding:

> Calling reproduction a major life activity is somewhat inartful. Reproduction is not an

> activity at all, but a process. One could be described as breathing, walking, or performing manual tasks, but a human being (as opposed to a copier machine or a gremlin) would never be described as reproducing. I assume that in using the term reproduction . . . the Court [is] referring to the numerous discrete activities that comprise the reproductive process . . . .

524 U.S. at 659 n.2 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part). Thus, whether *Bragdon* explicitly recognizes sexual relations as a major life activity or merely strongly suggests as much, we have little difficultly concluding that sexual relations is a major life activity under the Act.

Having decided that engaging in sexual relations qualifies as a major life activity, we next determine whether Adams has sufficiently alleged a substantial limitation on that activity. This is an individualized inquiry that focuses on Adams's own experience. *See Toyota*, 534 U.S. at 198 (requiring plaintiffs "to prove a disability by offering evidence that the extent of the limitation . . . in terms of their own experience . . . is substantial" (internal quotation marks omitted) (second omission in original)). Moreover, "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures—*both positive and negative*—must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." *Sutton*, 527 U.S. at 482 (emphasis added). Accordingly, in determining whether Adams's breast cancer substantially limited her in a major life activity, "[w]e must consider the actual effects of [her] impairment and the side effects of [her] treatment." *Gallagher*, 181 F.3d at 654.

Finally, in determining the substantiality of a claimed limitation, we may consider: (1) "[t]he nature and severity of the impairment;" (2) "[t]he duration or expected duration of the impairment;" and (3) "[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2) (EEOC regulations interpreting the ADA); *cf. Toyota*, 534 U.S. at 194 (assuming without deciding that EEOC regulations are reasonable and declining to decide what deference, if any, they are due).

According to Adams, her breast cancer treatment rendered her completely unable to engage in sexual relations. Due to the scarring from her mastectomy and breast reconstruction, her overall post-surgery physical appearance, lack of physical sensation, loss of libido accompanying her medication, or some combination of those factors, she claims that her "ability to enter into romantic relationships has been crippled indefinitely and perhaps permanently." Adams Decl. ¶ 49. The government nowhere challenges Adams's assertion that she was substantially limited in her ability to engage in sexual relations or that this limitation was anything but a direct result of her cancer treatment. By failing to do so, the government has effectively conceded—at least for summary judgment purposes—that Adams's claimed impairment did, in fact, substantially limit her in a major life activity. *See Bragdon*, 524 U.S. at 641 (noting that "[t]estimony from [plaintiff] that her HIV infection controlled her decision not to have a child [was] unchallenged" and therefore taken as true "[i]n the context of reviewing summary judgment"). Of course, a jury hearing Adams's testimony on this point could well decide otherwise. But at this stage of the litigation, Adams's breast cancer qualifies as a disability because it amounted to a physical impairment that substantially limited her in the major life activity of sexual relations.

The dissent disagrees, finding Adams's characterization of her substantial limitation insufficient for lack of "evidence that her impairment substantially limited her in a major life activity at any time before the alleged discriminatory acts in December 2003 and March 2004." Dissenting Op. 2. This argument fails for two reasons. First, the government never raised it, and we therefore "have no occasion to reach [it] in this case." *Bell v. Wolfish*, 441 U.S. 520, 532 n.13 (1979); *see also United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004) ("Ordinarily, arguments that parties do not make on appeal are deemed to have been waived."). Second, even were we to consider the argument, our standard of review on summary judgment requires us to view the evidence in Adams's favor, drawing all reasonable inferences from her statements. *See Woodruff v. Peters*, 482 F.3d 521, 526 (D.C. Cir. 2007). Although Adams could have stated with greater precision when her sexual limitation first arose, we think it reasonable to conclude that her alleged inability to engage in sexual relations began in September 2003 when Adams had her right breast removed and began taking tamoxifen—the two treatment methods driving her alleged sexual limitation. Given that Adams's limitation flowed directly from her post-surgery cosmetic disfigurement and drug regimen, it makes no sense to infer, as the dissent does, that the limitation first arose well into—or long after— her course of treatment. *See* Dissenting Op. at 2, 13 n.11. Accordingly, although we agree with the dissent that Adams must have "a record of an impairment that substantially limits one or more of the . . . plaintiff's major life activities," *id.* at 5 (*quoting Gallagher*, 181 F.3d at 655), we, unlike the dissent, believe that Adams has made the requisite showing.

In a footnote, our dissenting colleague offers a second argument not made by the government, namely that the Act offers Adams no protection because "the impairment—

cancer—and the claimed limitation—fear of sexual activity—never coincided." *Id.* at 12 n.11. In the dissent's view, Adams could thus find no refuge in the Act even if she had expressly stated that her sexual limitation commenced immediately following her mastectomy and before the State Department's alleged discriminatory acts. This interpretation renders the Rehabilitation Act a Catch-22 for cancer survivors like Adams: when impaired, she had no limitation, and when substantially limited, she'd been cured of her impairment. Not only does this approach render the Rehabilitation Act a mirage for claimants like Adams, but it ignores *Sutton*'s instruction that when identifying substantial limitations under the Act, courts must take into account "both positive and negative" effects of treatment measures. 527 U.S. at 482. The dissent's approach would exclude from the Act's coverage cancer patients who experienced few limitations on their life activities until they began the often grueling process of surgery, radiation, and/or chemotherapy. This seems an odd result for a remedial statute designed in no small part to protect cancer survivors from employment discrimination. *See* S. REP. NO. 93-1297, at 38-39.

Having left the sufficiency of Adams's claims unchallenged, the government's only argument boils down to this: an employer cannot be held liable for discrimination based on a record of a disability unless it knows not only about the employee's alleged history of a physical or mental impairment, but also how that impairment substantially limited a major life activity. As the government sees it, because Adams had not told the State Department—at the time it revoked her medical clearance—that her cancer limited her ability to engage in sexual relations, it cannot be held responsible for any alleged discrimination. Far from constituting a "spectacular red herring," Dissenting Op. 8, this is the sum total of the government's argument before this

court. For her part, Adams, again relying on *Bragdon*, rejects the view "that an employer is permitted to discriminate against a person with a disability so long as it is unaware of how the employee meets the definition of disability." Appellant's Opening Br. 34. Finding no support for the government's interpretation in the statute or the case law interpreting it, we agree with Adams.

Once again, *Bragdon* provides helpful guidance. There an individual infected with HIV visited a dentist. Aware of the patient's HIV status, the dentist performed an examination but upon discovering a cavity, refused to fill it in his office. *Bragdon*, 524 U.S. at 628-29. The patient sued under the ADA, alleging that the dentist had denied her equal access to a public accommodation on the basis of a disability. *See* 42 U.S.C. § 12182(a) (prohibiting discrimination on the basis of disability by any person operating a place of public accommodation). After holding that the plaintiff's HIV qualified as a disability under the ADA, the Supreme Court concluded that "no triable issue of fact impedes a ruling on the question of statutory coverage." *Bragdon*, 524 U.S. at 641. Notably the Court said nothing about whether the dentist knew or cared that the plaintiff was limited in the major life activity of reproduction—and that limitation had nothing to do with the dentist's refusal to treat the plaintiff— yet the Court concluded that the dentist could be found liable just the same. For the Court, it was enough that (1) the dentist knew the plaintiff had a physical impairment (HIV), (2) the impairment did, in fact, substantially limit a major life activity, and (3) the dentist denied treatment because of the plaintiff's impairment. The same analysis applies here. Viewed in the light most favorable to Adams, the record shows (1) the State Department knew Adams had a record of an impairment (breast cancer), (2) the impairment did, in fact, substantially limit a major life activity, and (3) the State

Department denied Adams employment because of her cancer history. True, *Bragdon* involved the ADA's "actual disability" definition, as the plaintiff had the impairment at the time she was refused treatment, but we see no principled reason why the same logic should not apply when the alleged discrimination is based on a history of a qualifying disease rather than on its present manifestation.

Even though Adams relies heavily on *Bragdon*, the government's brief never mentions the case. Instead, it relies on two cases from this circuit, *Crandall v. Paralyzed Veterans of America*, 146 F.3d 894 (D.C. Cir. 1998), and *Department of State v. Coombs*, 482 F.3d 577 (D.C. Cir. 2007). But neither of those cases stands for the proposition that an employer must know in what way the employee's impairment limits a major life activity in order to be held liable for disability discrimination. For example, in *Crandall* we held that a plaintiff's Rehabilitation Act claim failed because "he never told anyone" about his alleged *impairment*, i.e., "that he had been diagnosed with or treated for bipolar disorder or any other psychiatric disorder," 146 F.3d at 895, and we explained that to be held liable for disability discrimination an employer needs "awareness of the disability itself, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability," *id.* at 897. In *Coombs*, a Foreign Service officer challenged a negative performance evaluation and subsequent termination decision by the Foreign Service's Performance Standards Board. 482 F.3d at 578. After that decision was made, the employee submitted an affidavit from a psychiatrist alleging that he had various mental disorders. We held that no Rehabilitation Act discrimination claim could lie because, as was true in *Crandall*, the defendant employer had no knowledge of any alleged impairment when it made the challenged decision. Indeed, we explained—in language

relied on by the government—that the plaintiff must show "that the employer knew or had reason to know about the employee's alleged *impairment* when it made an adverse employment decision." *Id.* at 579 (emphasis added). Note the use of the word "impairment" rather than "limitation." Neither *Crandall* nor *Coombs* holds that an employer must know anything more than the employee's impairment to be held liable for discrimination. Indeed, the question we face here—whether the employer must know about the employee's particular limitation—was not before the court in either of those cases.

The district court cited two additional cases when rejecting Adams's "record of" claim—cases also cited in the government's brief: *Colwell v. Suffolk County Police Department*, 158 F.3d 635 (2d Cir. 1998), and *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220 (11th Cir. 1999). Neither case supports the government's position. In *Colwell*, the plaintiff claimed that a previous cerebral hemorrhage, which caused him to be hospitalized for thirty days, constituted a record of an impairment that substantially limited a major life activity. 158 F.3d at 645. The Second Circuit disagreed, explaining that although the plaintiff's "hospitalization is certainly a *record* of an impairment, and the hemorrhage was certainly an impairment," the plaintiff failed "to show that the impairment for which he was hospitalized was imposing a substantial limitation on one or more of his major life activities." *Id.* at 646. The court then recounted the plaintiff's evidence, concluding that none of it demonstrated a substantial limitation on any major life activity. *Id.* (noting that the "only evidence of the extent of the impairment caused by [plaintiff]'s hemorrhage" was a brief hospital stay, six months recovery at home, and several months of light duty upon his return to work). We agree with the government—and the *Colwell* court—that a record of

temporary hospitalization, without more, is insufficient to prove a disability. But more to the point, nothing in *Colwell* suggests that the record *presented to the employer* had to include information detailing the plaintiff's substantial limitation; the question was whether the record *before the court* established that the statutory standard had been met. Similarly, in *Hilburn* the Eleventh Circuit explained that "the record-of-impairment standard is satisfied only if [plaintiff] actually suffered a physical impairment that substantially limited one or more . . . major life activities." 181 F.3d at 1229. There, the plaintiff presented no evidence to the court that her claimed impairment, heart disease, had in fact limited any of her major life activities. *See id.* Here, by contrast, Adams not only has shown that the State Department was aware of her breast cancer history, but also has furnished uncontroverted evidence that the impairment did, in fact, substantially limit her ability to engage in sexual relations. We find this sufficient under the Act's "record of" definition. Just as in *Bragdon*, whether the State Department knew the precise details of her limitation is neither here nor there.

EEOC guidance interpreting the ADA's "record of" regulations supports this conclusion—indeed, it seems to go further. According to the guidance, "[t]he impairment indicated in the record must be an impairment that *would* substantially limit one or more of the individual's major life activities." 29 C.F.R. pt. 1630, app. § 1630.2(k) (emphasis added). And cancer, the guidance suggests, is a paradigmatic example of just such an impairment. *See id.* ("[T]his provision protects former cancer patients from discrimination based on their prior medical history.").

Moreover, the government's proposed knowledge requirement conflicts with other aspects of federal hiring procedures. According to HHS regulations interpreting the

Rehabilitation Act, federal employers "may not make preemployment inquir[ies] of an applicant as to . . . the nature or severity of a handicap." 45 C.F.R. § 84.14(a). Although this prohibition does not extend to "an applicant's ability to perform job-related functions," *id.*, no one suggests that engaging in sexual relations has anything to do with serving as a Foreign Service officer. Thus, under the government's view, Adams's claim fails because the State Department lacked knowledge of a fact that it was legally barred from asking about. That makes no sense at all.

For a similar reason, we reject the government's jurisdictional argument that Adams failed to exhaust her administrative remedies by omitting a reference to her sexual limitation on her formal EEO complaint. No such disclosure was necessary. A complainant need only file a signed statement with the agency that is "sufficiently precise to identify the aggrieved individual and the agency and to *describe generally the action(s) or practice(s) that form the basis of the complaint*." 29 C.F.R. § 1614.106(c) (emphasis added). Under this standard, Adams's complaint sufficed. Indeed, the EEO "Formal Complaint of Discrimination" form simply asked Adams, "Why do you believe you were discriminated against?" and to "[e]xplain specifically how you were discriminated against (treated differently from other employees or applicants) because of your physical disabilities." Nothing on the form asked how her impairment substantially limited a major life activity, and for good reason: given that employees often file administrative complaints without the aid of counsel, it would frustrate the statute's aim to expect employees not only to explain in their complaints the allegedly discriminatory action they suffered, but also to list the precise way in which they satisfy the Rehabilitation Act's definitional section in 29 U.S.C. § 705(20)(B). Here, Adams alleged that the State Department

denied her employment because she once had stage-one breast cancer. That suffices for administrative exhaustion purposes. *Cf. Shehadeh v. Chesapeake & Potomac Tel. Co. of Md.*, 595 F.2d 711, 727 (D.C. Cir. 1978) (noting in a Title VII case that "complaints to the Commission are to be construed liberally since very commonly they are framed by persons unschooled in technical pleading").

### III.

It seems to us that what's driving the government's argument is basic confusion over the various ways in which a person can suffer discrimination under the Act. An employer's knowledge of an employee's *limitation*—as opposed to her *impairment*—is certainly relevant when the disabled employee requests a workplace accommodation. As discussed above, in such cases the accommodation sought must relate to the limitation at issue. *See McAlindin*, 192 F.3d at 1237 ("[T]he major life activities affected by the impairment are relevant only to the extent that they affect the type of accommodation that may be necessary and whether the employer has provided a reasonable accommodation."); *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 164 (5th Cir. 1996) ("This distinction is important because the ADA requires employers to reasonably accommodate limitations, not disabilities."). But in pure discrimination cases like Adams's, an employer's knowledge of the precise limitation at issue is irrelevant; so long as the employee can show that her impairment ultimately clears the statutory hurdle for a disability—i.e., it substantially limited a major life activity— the employer will be liable if it takes adverse action against her based on that impairment.

Consider the following hypothetical. Suppose a telephone receptionist takes a leave of absence from work because he's experiencing headaches only to discover that he

has a malignant brain tumor. The tumor is surgically removed, rendering the employee cancer-free. As a result of the treatment, however, the employee experiences significant hearing loss. Now suppose the employer learns about the tumor—but has no idea about the hearing loss—and informs the employee he's not welcome back at work *because he had cancer*. Is that illegal discrimination under the Act? Of course it is. In such situations it makes no difference whether an employer has precise knowledge of an employee's substantial limitation; as in *Bragdon*, it is enough for the employer to know about the impairment. *Cf. Blackwell v. Dep't of Treasury*, 830 F.2d 1183, 1183-84 (D.C. Cir. 1987) (stating that the Rehabilitation Act does not require complainants to provide employers with "precise notice of a handicap"). If, however, the hypothetical telephone receptionist sought an accommodation from his employer so that he could return to work, the employer would obviously need to know about the employee's claimed hearing limitation. The upshot is this: if an employer discriminates against an employee on the basis of a physical or mental impairment, or the record thereof, and if the impairment in fact qualifies as a "disability" under the Act, i.e., it substantially limits or once limited a major life activity, then the employer may be vulnerable to a charge of employment discrimination.

This conclusion makes sense because creating a knowledge requirement in situations involving pure discrimination would shield the most ignorant, irrational, and prejudiced employers—precisely the kinds of employers Congress intended the Act to reach. Under the government's theory, an employer could lawfully fire an employee solely for revealing that she had recovered from ovarian cancer after undergoing a hysterectomy, so long as the employer didn't know the effect such treatment has on reproduction. A better

informed employer, however, would suffer the full consequences of his decision. Congress could not have intended ignorance to act as a safe harbor. Moreover, in the government's view, to preserve a claim under either the Rehabilitation Act or the ADA, cancer survivors would have to announce to employers, "Yes, I once had cancer, and it substantially limited me in the following major life activities." Absent such disclosure, the employer could discriminate at will simply because he didn't like having cancer survivors around the office, or because he harbored "the irrational fear that they might be contagious." *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 284 (1987). As amici point out in their brief, Congress enacted the Rehabilitation Act and the ADA to forbid such blatantly discriminatory actions, intending to protect cancer survivors who qualify as disabled under the statute from employment discrimination based on myths, fears, and stereotypes about the disease.

## IV.

In sum, because Adams has provided sufficient evidence showing that she has a record of an impairment that substantially limited her in a major life activity, and because the government nowhere contested any of the evidence Adams offered in support of her disabled status, we reverse the district court's grant of summary judgment to the State Department and remand for proceedings consistent with this opinion.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting:

My colleagues and I agree that the only way Kathy Adams (Adams) survives summary judgment in favor of the U.S. Department of State (Department) on her Rehabilitation Act claim is under 29 U.S.C. § 705(20)(B)(ii), the "record of impairment" definition of "disability."[1] Applying the well-settled standard set forth in *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), I am convinced that Adams "has failed to make a sufficient showing on an essential element of her case." Accordingly, I believe the district court correctly granted summary judgment to the Department and I respectfully dissent.[2]

---

[1]The Rehabilitation Act of 1973 (Rehabilitation Act or Act) defines "individual with a disability" as

"any person who—

(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;

(ii) has a record of such an impairment; or

(iii) is regarded as having such an impairment.

*Id*. § 705(20)(B). Adams has no claim under section 705(20)(B)(i) ("first prong") because her physical impairment—Stage one breast cancer—was "cured" by her mastectomy and she does not meet section 705(20)(B)(iii) ("third prong") under *Gasser v. District of Columbia*, 442 F.3d 758 (D.C. Cir. 2006); *see also Duncan v. Washington Metro. Area Transit Auth.*, 240 F.3d 1110 (D.C. Cir. 2001) (en banc). Her remaining claim is her "record of impairment" ("second prong") claim.

[2]In light of my dissent from the "record of impairment" holding, I would not reach the question, as yet unanswered in this Circuit, whether sexual activity constitutes a major life activity under the statutory definition. In asserting that such a limitation exists, the majority relies on *Bragdon v. Abbott*, 524 U.S. 624 (1998), in which the United States Supreme Court held only that "reproduction" is a

2

To be an "individual with a disability" under the second prong of section 705(20)(B), Adams must "ha[ve] a record of such an impairment." "Such an impairment" refers to the first prong, that is, an "impairment which substantially limits one or more . . . major life activities," 29 U.S.C. § 705(20)(B)(i). *See Webster's Third New Int'l Dictionary* 2283 (1993) (defining "such" as "having a quality already or just specified"). Thus, there must be a record, or a history, showing that at some time before the alleged discrimination Adams had a disability under the first prong. *See Heisler v. Metro. Council*, 339 F.3d 622, 630 (8th Cir. 2003) ("To have a record of an impairment, an employee must 'ha[ve] a history of . . . a mental or physical impairment that substantially limits one or more major life activities.' " (quoting 29 C.F.R. § 1630.2(k) (alteration in Heisler))). While it is undisputed that she had an impairment—breast cancer—during the fall of 2003, she offered no evidence that her impairment substantially limited her in a major life activity at any time before the alleged discriminatory acts in December 2003 and March 2004.[3] Instead, Adams relied on allegations made long after the fact. In her amended complaint, filed some 15 months after the Department reduced her medical clearance, Adams asserted *for the first time* that she "*is* . . . limited in the major life activity of sexual contact and romantic intimacy" and "[t]his limitation may be due to a variety of physical and psychological effects of cancer

_____

major life activity. *See* 424 U.S. at 638-39. The *Bragdon* Court did not address whether sexual activity outside of the reproduction context qualifies as Adams claims.

[3]Because the inquiry focuses on "*such person's* major life activities," 29 U.S.C. § 705(20)(B)(i) (emphasis added), it does not suffice that a record of breast cancer *can* substantially limit a major life activity. Instead, Adams must demonstrate that at the time of the alleged discrimination *she* had such a record.

treatment." *Adams v. Rice*, No. 05-941, Am. Compl. ¶ 12 (D.D.C. filed March 9, 2005) (emphasis added).[4] She elaborated somewhat in a subsequent declaration:

> Like many breast cancer survivors, whether by virtue of my discomfort with the way my body looks, loss of sensation after my surgeries, my deepseated fear that prospective suitors will reject me because of my history of cancer, loss of a breast, and current physical appearance, or the side effects of medication that causes loss of libido, I *now* find the prospect of dating and developing an intimate relationship just too painful and frightening.

Nov. 26, 2005 Decl. of Kathy E. Adams ¶ 49 (emphasis added). In both statements, Adams described only a *current* (2005) limitation, using a present tense verb and the adverb "now." She has never asserted that the limitation (and thus her disability) existed before the alleged discrimination. In the absence of *any record*—documentary, or otherwise—of a qualifying impairment when she was allegedly discriminated against, the second prong was not satisfied and therefore Adams was not as a matter of law an "individual with a disability" protected under the Act. That the second prong requires a record that manifests *both* a physical or mental impairment and its substantial limitation on a major life activity is reinforced by decisions from other circuits.

---

[4]Adams, herself a lawyer, made no mention of the alleged sexual limitation in her EEOC complaint or her original district court complaint. In fact, in her EEOC complaint dated July 22, 2004—several months after the alleged discrimination occurred—she affirmatively declared that she had "resumed *all physical* activities," making no exception for sexual activities. Formal Compl. of Discrimination 1 (emphasis added).

4

In *EEOC v. R.J. Gallagher Co.*, 181 F.3d 645 (5th Cir. 1999), the Fifth Circuit recognized that under the definition of "disability" in the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102(2)(A), which tracks almost verbatim the Rehabilitation Act's definition of "individual with a disability,"[5] the historical record must indicate both an impairment and a major life activity limitation. The *Gallagher* court relied on the Supreme Court's decision in *Sutton v. United States*, 527 U.S. 471 (1999) (*Sutton*), in which the Court held that neither of two severely myopic sisters, who had been rejected for positions as commercial airline pilots, had a disability under the ADA. The Court explained that, although each sister had an impairment (severe myopia), the impairment did not limit a major life activity at the time they claimed they were discriminated against because each sister's vision was by then normal (or better) with corrective lenses. Citing *Sutton*, the *Gallagher* court rejected a portion of the EEOC interpretive guidance promulgated in 1991 stating that the record of impairment prong " 'protects former cancer patients from discrimination based on their prior medical history' " 181 F.3d at 655 (quoting 29 C.F.R. pt. 1630, App. § 1630.2(k)) (interpreting statutory phrase "record of such impairment"). The court explained:

---

[5]The ADA definition of "disability" provides:

The term "disability" means, with respect to an individual—

**(A)** a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

**(B)** a record of such an impairment; or

**(C)** being regarded as having such an impairment.

42 U.S.C. § 12102(2).

> This broad position obviously cannot be the rule in the wake of *Sutton*, which emphasizes both the ADA's requirement of individualized inquiry and a focus on the actual effects of the impairment. In other words, it is not enough for an ADA plaintiff to simply show that he has a record of a cancer diagnosis; in order to establish the existence of a "disability" under § 12102(2)(B), *there must be a record of an impairment that substantially limits one or more of the ADA plaintiff's major life activities.*

*Id*. (emphasis added). Here, as in *Gallagher*, there was a record of cancer but no record of any substantial limitation it produced.

Even more on point is the Second Circuit's decision in *Colwell v. Suffolk County Police Department*, 158 F.3d 635 (2d Cir. 1998). In *Colwell*, three police officers asserted they had been passed over for promotion on account of the lingering effects of past injuries, claiming they were disabled under all three prongs of the ADA definition. The Second Circuit first rejected the plaintiffs' impairment claims under the first prong because they failed to produce "evidence sufficient to show that the limitation [each] suffered with respect to a major life activity was substantial." 158 F.3d at 645. The court then addressed the plaintiffs' record of impairment claims and rejected them as well, quoting language from the same EEOC interpretive guidance discussed in *Gallagher*.[6] The interpretive language the

---

[6]The EEOC interpretive guidance on the record of impairment prong states in pertinent part:

> The second part of the definition provides that an individual with a record of an impairment that substantially limits a major life activity is an individual with a disability. The intent of this provision, in part, is to ensure that people are not discriminated against because of a history of disability. For example, this provision protects former

*Colwell* court discussed states: "This part of the definition is satisfied *if a record relied on by an employer indicates* that the individual has or has had a *substantially limiting* impairment." 29 C.F.R. pt. 1630, App. § 1630.2(k) (emphases added). Relying on this language, the court rejected the plaintiffs' contention that their personnel records "show[ed] a history of a substantially limiting impairment" because "the records of impairment that each plaintiff showed involved no greater degree of limitation of major life activities than the continuing impairments they showed." 158 F.3d at 645. In the Second Circuit's view, the personnel records were inadequate to establish a "record" of a *qualifying* impairment under the second prong because they manifested only an impairment and not a resulting major life activity limitation.

Like the plaintiffs in *Colwell*, Adams has pointed to a record existing at the time of the alleged discrimination that identified an impairment but none that even suggested a resulting substantial limitation. To the contrary, the record in late 2003 to early 2004 painted a rosy picture of Adams's condition, indicating she had made a full recovery. *See, e.g.*, 12/9/03 Letter from Adams to State Dep't Office of Med. Servs. (reporting after doctor visit: "Everything is fine."); 11/19/03 Letter from Dr. Mark A. O'Rourke to State Dep't ("At this time,

---

cancer patients from discrimination based on their prior medical history. * * * This part of the definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment. The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities. There are many types of records that could potentially contain this information, including but not limited to, education, medical, or employment records.

29 C.F.R. pt. 1630, App. § 1630.2(k).

Kathy has no job limitations whatsoever. She is cancer-free and is able to undertake a full schedule of work, travel, and vigorous sports, as she had already enjoyed. . . . I can say with complete confidence that this history of breast cancer will not slow her down one bit at all."); 1/12/04 Letter from Dr. Mark A. O'Rourke to State Dep't Bd. of Exam'rs for Foreign Serv. ("She has fully recovered from her surgeries . . . She remains cancer-free. . . . Kathy's post-cancer status is in no way incapacitating. She has no performance limitations whatsoever on her ability to work, travel, or engage in the vigorous sports she enjoys . . . ."). Given that she had no record of a qualifying impairment when the Department reduced her medical clearance and denied her a waiver, she could not then be an individual with a disability under 29 U.S.C. § 705(20)(B) so as to be protected by the Act. In asserting otherwise, the majority does precisely what the Fifth Circuit in *Gallagher* proscribed as contrary to *Sutton*, namely, finding that a person has a disability based on a record of a cancer diagnosis but without a record of a resulting substantial limitation. *See Gallagher*, 181 F.3d at 655. The majority's holding similarly conflicts with the Second Circuit's conclusion in *Colwell*, 158 F.3d at 645.

Most recently, the Eleventh Circuit decided a first prong Rehabilitation Act claim that is nonetheless strikingly similar to Adams's. In *Garrett v. University of Alabama, Birmingham*, 507 F.3d 1306, 1315 (11th Cir. 2007), the plaintiff, who was also diagnosed with breast cancer, underwent two surgeries, a course of radiation and chemotherapy treatments between August 1994 and June 1995. She returned to work in July 1995 and on July 21, 1995, her supervisor allegedly demoted her on account of her cancer. Garrett's limitations included "caring for herself, performing manual tasks, lifting, and working." *Id.* at 1310. The Eleventh Circuit affirmed the grant of summary judgment to the defendant, rejecting the plaintiff's reliance "not only upon the status of her impairments and limitations prior to [demotion] but also [her] misplace[d] . . . reliance upon her

condition years after . . . ." *Id*. at 1312. Adams's reliance on her belated claim of a sexual limitation in 2005 is equally misplaced—and fatal to her case. In accepting her claim as a sort of *nunc pro tunc* allegation, the majority directly clashes with the Eleventh Circuit's holding in *Garrett*.[7] As the Eleventh Circuit correctly stated: "The Rehabilitation Act does not protect employees who become disabled after the discriminatory act, but protects those employees who were disabled at the time of the discriminatory act." 507 F.3d at 1315.

Additionally, the majority's focus on notice in this case is a spectacular red herring. *See* maj. op. 23-28, 29-31. Notice is not an issue because Adams did not have the requisite record of which the Department *could* have had notice when it reduced Adams's medical clearance. Nonetheless, given the support for such a requirement in the case law, I cannot let pass unchallenged the majority's dicta rejecting a notice requirement.

The Rehabilitation Act imposes liability only if the employer discriminates against the applicant "solely by reason of her or his disability," 29 U.S.C. 794(a). In *Crandall v. Paralyzed Veterans of America*, 146 F.3d 894 (D.C. Cir. 1998), we made clear that the quoted language requires that the employer be on notice of the claimed "*disability*," that is, on notice of both the impairment *and* the resulting limitation that together constitute the disability.[8] *See* § 705(20)(B)(i). In *Crandall*, the plaintiff

---

[7]Adams's 2005 allegations suffer from yet another defect the *Garrett* court highlighted. Her amended complaint and her declaration describe the causal link between her cancer treatment and the alleged sexual limitation only "in general and vague terms," 507 F.3d at 1315 (noting "the lack of any *objective* evidence of the extent of Garrett's limitations") (emphasis added). *See* Am. Compl. ¶ 12 ("*may* be due to"); Adams Decl. ¶ 49 ("*whether* by virtue of").

[8]In *Crandall*, we applied the version of section 794(a) in effect at the time of the alleged discrimination, which version prohibited

9

was fired for "acts of rudeness" and afterward disclosed to the employer that he had been diagnosed as suffering from bi-polar disorder. The district court granted summary judgment to the employer, holding that "no reasonable factfinder could have found that [the employer] discriminated on the basis of [the employee's] disability, since it had neither actual nor constructive notice of his disability when it fired him." 146 F.3d at 895. We affirmed, declaring quite broadly:

> The courts of appeals have overwhelmingly agreed that for this causal link to be shown the employer must have acted with an awareness *of the disability itself*, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability. They have so found under both the Rehabilitation Act itself and the analogous provision of the [ADA], 42 U.S.C. § 12112(a) (providing that no employer "shall discriminate against a qualified individual with a disability because of the disability of

---

discrimination against an "otherwise qualified *handicapped* individual in the United States . . . solely by reason of his handicap," 29 U.S.C. § 794(a) (1992). Although the language was amended in 1992 to replace "handicap" with "disability," *see* Pub. L. No. 102-569, § 102(p)(36), 106 Stat. 4344, 4360 (1992), the earlier version defined "individual with handicaps" in the same way that the current version defines "individual with a disability." *Compare* 29 U.S.C. § 706(8)(B) (1992) *with* 29 U.S.C. § 705(2)(B)(2008). Notwithstanding we applied the "handicap" version in *Crandall*, we used the then-current statutory term "disability" throughout the text of the opinion in place of the dated "handicap." *Compare* 146 F.3d at 896 (quoting statutory prohibitions against discriminating against a "handicapped individual . . . solely by reason of his handicap") *with id*. at 897 (rejecting argument that "if the poor performance causes dismissal, then the dismissal was 'by reason of' the disability" so as to satisfy the statutory prohibition).

such qualified individual . . . .").  *See, e.g., Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 163 (5th Cir. 1996) ("To prove discrimination [under the ADA], an employee must show that the employer knew of such employee's *substantial physical or mental limitation*."); *Morisky v. Broward County*, 80 F.3d 445, 447-49 (11th Cir. 1996) (liability under the ADA requires actual or constructive *notice of the disability*); *Collings v. Longview Fibre Co.*, 63 F.3d 828, 834 (9th Cir. 1995) (assuming plaintiffs had a medically recognizable drug *disability*, they could not make out a case under the ADA where they could not show that employer was aware of it); *Miller v. National Casualty Co.*, 61 F.3d 627, 629 (8th Cir. 1995) (under ADA, "[b]efore an employer must make accommodation for the physical or mental *limitation* of an employee, the employer must have knowledge that such a *limitation* exists."); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir.1995).

146 F.3d at 896-97 (emphases added).  That *Crandall* and the decisions it quotes use "disability" and "limitation" rather than "impairment"—each of which terms has a precise statutory meaning—manifests that the employer must have notice of both the impairment and the limitation that make up the disability. And it is of no consequence that *Crandall* is a first prong case because a second prong case must incorporate a first prong disability.  *See infra* note 11.

To support its contention that an employer need have notice only of an impairment and not of a limitation (at least if the limitation does not require accommodation, *see* maj. op. 29-30), the majority looks to the Supreme Court's decision in *Bragdon v. Abbott*, 524 U.S. 624 (1998), in which the Court concluded that a woman infected with the human immunodeficiency virus (HIV) was disabled under the first prong because her impairment, HIV, limited her major life activity of reproduction.

524 U.S. at 631-48. The majority emphasizes that "the Court said nothing about whether the dentist knew or cared that the plaintiff was limited in the major act of reproduction." Maj. op. 24. The Court's silence, however, is unremarkable given that the dentist's knowledge *vel non* of the limitation was not one of the issues the respondent dentist raised in his petition and on which the court granted certiorari. *See Bragdon*, 524 U.S. 628 ("We granted certiorari to review, first, whether HIV infection *is* a disability under the ADA when the infection has not yet progressed to the so-called symptomatic phase; and, second, whether the Court of Appeals, in affirming a grant of summary judgment, cited sufficient material in the record to determine, as a matter of law, that respondent's infection with HIV posed no direct threat to the health and safety of her treating dentist.") (emphasis added).[9]

---

[9]While I have assumed *arguendo* that sexual activity constitutes a major life activity, *see supra* note 2, I note that the Department's position is that sexual activity "can" qualify "to the [extent] that procreation may be implicated." Oral Arg. at 20:15. But the Department has nowhere accepted that Adams had that limitation at the time of the medical clearance denial nor could it inasmuch as at that point she had not even mentioned the limitation. In fact, Adams's counsel, in response to a question about Adams's failure to so note in her EEO complaint, said that an immediate limitation resulted from the *treatment*. Oral Arg. at 17:15. Adams's physical impairment, however, was the breast cancer, not the mastectomy. While I agree that the Department did not define what precisely the "record" of impairment must comprise under prong two, we of course are free to affirm on that ground. *See In re Swine Flu Immunization Prods. Liab. Litig.*, 880 F.2d 1439, 1444 (D.C. Cir. 1989). Moreover, because the issue is one of statutory construction, I believe we are obligated to construe it accurately. *See Eldred v. Ashcroft*, 255 F.3d 849, 853 (D.C. Cir. 2001) (en banc) (" 'When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to

12

In sum, because Adams had no record—documentary, or otherwise—of a *qualifying* impairment when the Department allegedly discriminated against her,[10] I would affirm the district court's grant of summary judgment on the ground that she was "unable to demonstrate that she is disabled within the definition of the Rehabilitation Act." 484 F. Supp. 2d at 17.[11]  I therefore

_____

identify and apply the proper construction of governing law.' " (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)); *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) ("[The] court may consider an issue antecedent to and ultimately dispositive of the dispute before it, even if the parties fail to identify and brief." (ellipsis and quotations omitted)).

[10]The majority acknowledges that Adams could have described "with greater precision" when her sexual limitation began but finds it "reasonable to conclude that [it] began in September 2003," maj. op. 22, as a result of her "course of treatment." *Id.*  The reasonableness of the majority's conclusion escapes me both in light of the showing Adams *did* make of her "full recovery" by December 2003, supra pp. 6-7, and in light of case law rejecting recuperation from surgery as a qualifying limitation.  *See, e.g.*, *Garrett*, 507 F.3d at 1315 (" 'A temporary inability to work while recuperating from surgery is not . . . a permanent or long-term impairment and does not constitute evidence of a disability covered by the Act.' " (quoting *Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999))).

[11]Unlike the majority, I believe that Adams's first prong deficiency also dooms her second prong claim.  Adams failed to establish a first prong disability because she offered no evidence that at the time she was allegedly discriminated against, she was simultaneously both impaired and limited in a major life activity so as to qualify under the first prong, which applies only to a person who "*has* a physical or mental impairment which substantially *limits* one or more of [her] major life activities."  (Emphasis added.) Significantly, each of the first prong's requirements is expressed in the present tense, indicating that each must occur simultaneously, that is,

respectfully dissent.[12]

_____

the person must have an impairment and the impairment must limit a major life activity *at the same time.* That the tense of the verbs is significant is clear from the Supreme Court's *Sutton* opinion, in which the Court relied heavily on the statute's use of "the present indicative verb form" of "limits," which the Court interpreted as "requiring that a person be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability." 527 U.S. at 482. The verb "has" in the same provision is the same tense as "limits"—the present indicative. In other words, the plain language of the first prong requires that a disabled person have an impairment and a resulting limitation occurring together. In Adams's case, the impairment—cancer—and the claimed limitation—fear of sexual activity—never coincided. Once Adams's treatment was complete, she no longer had an impairment because her cancer was gone. *See* 11/19/03 Letter from Dr. Mark A. O'Rourke to State Dep't (declaring Adams "cancer-free"). Nor was Adams disabled under the first prong *before* her treatment (when she still had the impairment of cancer) because she did not then experience the limitation she now claims. Her sexual limitation arose only after and as a result of her cancer treatment. *See* Nov. 26, 2005 Decl. of Kathy E. Adams ¶ 49 and *Adams v. Rice*, No. 05-941, Am. Compl. ¶ 12 (both quoted *supra* pp. 2-3). How long after, we can only guess on this record. *See supra* pp. 2-3 & note 4. Because Adams never had an impairment that, at the time she had it, substantially limited a major life activity under the first prong, she could likewise not have a "record of such an impairment" under the second prong.

[12]It is the timing of this case, I think, that makes it such a bad fit under the Rehabilitation Act and, consequently, a bad candidate for a precedent-setting opinion on the requirements of a second prong claim. There are record indications that, had Adams delayed pursuing her Foreign Service career somewhat longer than three months post-op, the Department would have considered her fit for duty. *See, e.g.*, Brown Decl. ¶¶ 3, 4; FAQ (JA 104).