# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 15, 2015          Decided April 5, 2016

No. 14-5156

AHMAD B. NURRIDDIN,
APPELLANT

v.

CHARLES F. BOLDEN, ADMINISTRATOR, NATIONAL
AERONAUTICS AND SPACE ADMINISTRATION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-02052)

*Joshua David Rogaczewski* argued the cause for appellant. With him on the briefs were *Paul M. Thompson* and *Jeffrey W. Mikoni*.

*R. Craig Lawrence*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Vincent H. Cohen*, Acting U.S. Attorney, and *Andrea McBarnette*, Assistant U.S. Attorney.

Before: BROWN and WILKINS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM.

Opinion dissenting in part filed by *Circuit Judge* WILKINS.

PER CURIAM: This is the second time Ahmad Nurriddin has brought suit against his former employer, the National Aeronautics and Space Administration ("NASA"), claiming unlawful discrimination. In his first appeal to us, we affirmed grant of summary judgment to NASA on Nurriddin's various claims of discrimination and retaliation over a six-year period. *Nurriddin v. Griffin* (*Nurriddin II*), 222 F. App'x 5 (D.C. Cir. 2007). Now focusing on a series of events occurring between 1996-2004, Nurriddin once more claims discrimination and retaliation under the Rehabilitation Act and Title VII. We affirm the District Court's Rule 12(b)(6) dismissal of the former claims, and grant of summary judgment to the agency on the latter.

## I.

To provide some necessary context, we begin at the beginning. Nurriddin is an African-American, Muslim male. He worked in NASA's Educational Affairs Division, first as a Publication Specialist, and eventually as an Education Programs Specialist. For more than a decade Nurriddin has accused NASA management of discrimination. Beginning in 1991, Nurriddin believed he should have been converted to a full-time civil servant position at a grade higher than his GS-12 level. *Nurriddin v. Goldin (Nurriddin I)*, 382 F. Supp. 2d 79, 86 (D.D.C. 2005). Thereafter, he sought for years to obtain a promotion. *Id.* at 95, 102. He eventually brought suit *pro se* under Title VII on the basis of this denied promotion, as well as additional incidents of alleged discrimination. *Id.* at 90. These incidents included, among

others, being denied funds to travel to a Conference of Engineering Deans of Historically Black Colleges and Universities, *id.* at 101, and being exposed to his then co-worker, later first-level supervisor's computer desktop, which contained empty folders titled, "racist jokes and stories" and "W/American Heritage," *id.* at 87, 108. We summarily affirmed the District Court's grant of summary judgment to NASA. *Nurriddin II*, 222 F. App'x at 6.

This suit concerns the time period from 1996 until Nurriddin's termination in 2004. By 1996, Nurriddin was still employed within the Education Division at a GS-12 level. His "first-level" supervisor was Malcolm Phelps, and his "alternate first-level supervisor" was Sherri McGee. His "second-level supervisor" was Frank Owens. These three and several other human resources directors and employees were to become the subject of nine EEO complaints by Nurriddin between June 1997 and June 2004.

In 1996, Nurriddin received a performance evaluation of "Outstanding" for the time period 1995-1996, which was the highest possible rating on the five-level scale used by the agency at the time. He received a non-competitive promotion to the GS-13 level in November 1997. Still, Nurriddin believed NASA was discriminating against him for previously filing EEO complaints. He filed two complaints in 1997 naming Owens, McGee, and Phelps as the responsible management officials.

Nurriddin filed two more EEO complaints in 1998 that also named these three supervisors. The first, filed in April of 1998, was predicated in part on a coworker's comment to Nurriddin that Phelps said his performance evaluation would be lowered because he attended "too many minority conferences." Nurriddin filed the second complaint in

September 1998, after he received his performance review for the 1997-1998 period. That year, NASA switched to a pass-fail system. Nurriddin received a "pass" and an $800 performance award. Phelps, however, noted on the evaluation form a "pattern of missed deadlines and unresponsiveness to his management that must be addressed and improved during the next year for [his] work to continue to be judged satisfactory." In his evaluation meeting, Nurriddin contends that Phelps "lashed out," calling his EEO complaints "a bunch of bull and a crock of s-h-i-t."

As the administrative investigation into his complaints proceeded, Nurriddin's white coworker received a grade increase from GS-13 to GS-14. Nurriddin did not. Around this same time, Nurriddin's health began to decline on account of depression, anxiety, and back pain, all allegedly related to his job and confrontations with his supervisors. He and Phelps exchanged numerous correspondence on the proper medical documentation necessary for approval of his sick leave. In October of 1998, his doctor recommended to NASA that it transfer him to another department to alleviate his job-related stress. In November and December of 1998, Nurriddin also requested permission to travel to two "minority conferences," which NASA denied.

NASA eventually approved a detail for Nurriddin. Though, when first exploring the possibility, a human resources official wrote that one particular office might only agree to the arrangement "subject to some conditions such as resolution of the EEO complaints." Nurriddin filed another EEO complaint thereafter in January of 1999. In February 1999, Nurriddin began a one-year long detail with the National Science Foundation ("NSF"). His NSF supervisor described his performance as "superb" and praised his "excellent skills in adapting to the rigors of a new office."

In August 1999, Nurriddin filed an EEO complaint naming his NASA supervisors, which for the first time included a claim of disability discrimination.

Nurriddin returned to NASA in the spring of 2000. He requested transfer to a different office as a reasonable accommodation and soon took medical leave. He did not return again except for a few days in May and September. He and management attempted to reach agreement on the proper medical documentation for his periods of absence.

By this point, Nurriddin had joined NASA's Voluntary Leave Transfer Program, which allows eligible employees to receive annual leave donated by other federal employees. Yet, his status was changed to "AWOL," or away without leave. In a June 19, 2000 email, a human resources official reminded that Nurriddin had been accepted into the leave transfer program. In response, human resources director Al Castillo wrote: "Yegads! Will we ever finish with this guy? . . . For the time being, I'm going to let the AWOL stand as charged. If we need to correct it as a result of our discussion, I don't have a problem stating so in writing." Nurriddin remained on AWOL status from September 12, 2000 through December 1, 2000. Eventually, 737.5 hours of donated leave were credited to him.

In September of 2000, Phelps denied Nurriddin a "WGI," or Within Grade Increase. These increases are automatically awarded to federal employees after satisfactorily completing a certain number of calendar weeks in service. 5 U.S.C. § 5335. Phelps justified the denial on the basis that Nurriddin had not worked in the office long enough in the past year for his performance to be rated acceptable. Around December 2000, Nurriddin began receiving workers' compensation benefits. Nurriddin filed another EEO complaint that same

month naming as responsible management officials, among others, Owens, Phelps, and Al Castillo and Vicki Novak from Human Resources.

In 2001, NASA commenced a job search to find Nurriddin another position. In October 2001, it offered him a "new" job in his same position, this time under the supervision of McGee and Owens. NASA arrived at this decision after discussing various options over email throughout September 2001. In a message with the subject line, "Favorite Subject," Vicki Novak wrote: "I really do not want to offer him another job in F. He's not qualified and he'll just create major problems if he should accept." Castillo responded:

> [L]egal counsel, below Bob's level, asked if CP could find him a job and make an offer to close off the [Office of Workers' Compensation Program ("OWCP")] claim (expecting that he won't take it and therefore lose his case at OWCP). That claim, backed by his doc and supported by the OWCP doc's, is that he CANNOT work in FE because that's the source of his "medical" problem. The offer of a job is a tactical ploy to chip away at all his complaints.

The Office of Workers' Compensation Program originally found the job offer suitable and gave Nurriddin 30 days either to accept the offer or to provide an explanation for refusal. In January 2002, Nurriddin filed another EEO complaint, this time naming Mark Batkin from the General Counsel's Office, Dorothy Egbert from Human Resources, as well as Castillo, Novak, and Owens. OWCP reevaluated the job offer and found it unsuitable since his supervisors would remain Owens and McGee, who were named in the original

complaint. In the meantime, Nurriddin received his WGI to a GS-13 level step 5.

Also in 2002, NASA underwent a reorganization. Clifford Houston replaced Phelps as Nurriddin's first-level supervisor. With Nurriddin still out of the office, in October 2003, Houston ordered another job search be conducted, but the search revealed no vacant positions suitable for Nurriddin. Houston subsequently proposed that Nurriddin be terminated; he needed someone to fill the position and help ease the office's workload. In 2004, Nurriddin's new third-level supervisor, Angela Phillips Diaz, terminated his position effective February 6, 2004. The termination letter's stated rationale was that Nurriddin was "medically unable to perform [his] duties, and that this action [wa]s necessary in order to promote the efficiency of the service." Nurriddin had not worked since 2000.

Nurriddin, originally *pro se*, filed suit under Title VII and the Rehabilitation Act. In 2009, the District Court granted in part and denied in part NASA's motion to dismiss or in the alternative for summary judgment. *Nurriddin v. Bolden* (*Nurriddin III*), 674 F. Supp. 2d 64, 97 (D.D.C. 2009). The court dismissed Nurriddin's claims of disability discrimination and retaliation, as well as his hostile work environment claim.[1] It permitted eight Title VII claims to proceed, including discrimination and retaliation based on: 1) denial of a noncompetitive promotion in 1998; 2) an $800 performance award in 1998; 3) denial of two travel requests in 1998 (retaliation claim only); 4) denial of a performance

---

[1] The court furthermore dismissed Nurriddin's request for injunctive relief to prevent NASA from communicating with the Office of Workers' Compensation Program, 674 F. Supp. 2d at 95, as well as a claim against various agency officials for conspiracy to violate his constitutional rights, *id.* at 81.

award in 1999; 5) designation as AWOL for 59 days in 2000; 6) denial of donated leave after 2000, 7) denial of a WGI before 2001, and; 8) termination in 2004.

After discovery and retaining counsel, Nurriddin filed a motion for partial summary judgment, while NASA filed its own summary judgment motion. The court granted NASA's motion. *Nurriddin v. Bolden* (*Nurriddin IV*), 40 F. Supp. 3d 104, 110 (D.D.C. 2014). Nurriddin now timely appeals.

## II.

We first tackle the District Court's dismissal in 2009 of Nurriddin's Rehabilitation Act claims under Rule 12(b)(6).[2] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in a plaintiff's favor. *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). We need not, however "accept inferences drawn by [a] plaintiff[] if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nor must we accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

---

[2] On brief, NASA focused on whether Nurriddin produced enough evidence of disability discrimination to survive summary judgment, but the district court dismissed Nurriddin's Rehabilitation Act claims under Rule 12(b)(6). *See Nurriddin III*, 674 F. Supp. 2d at 79, 84-85.

**A.**

Nurriddin alleged that he was the subject of adverse actions because of his disability or perceived disability, based on his depression, anxiety, and back pain.  The Rehabilitation Act prohibits federal agencies from engaging in employment discrimination against disabled individuals.  *See* 29 U.S.C. § 791(b); *Adams v. Rice*, 531 F.3d 936, 942 (D.C. Cir. 2008).  It requires federal employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  *Doak v. Johnson*, 798 F.3d 1096, 1098 (D.C. Cir. 2015) (citing 42 U.S.C. § 12112(b)(5)(A)).

A person is disabled if she has 1) a physical or mental impairment that substantially limits one or more major life activities; 2) a record of such an impairment; or 3) if she is regarded as having such an impairment.[3]  *See* 29 U.S.C. § 705(20) (B) (cross-referencing 42 U.S.C. § 12102(1)).  Assuming that working is a major life activity, *see Adams*, 531 F.3d at 945, "one must be precluded from more than one type of job, a specialized job, or a particular job of choice" in order to be considered "substantially limited" in working, *Duncan v. Wash. Metro. Area Transit Auth.*, 240 F.3d 1110, 1114 (D.C. Cir. 2001) (quoting *Sutton v. United Air Lines*, 527 U.S. 471, 492 (1999)).  The third, "regarded as" prong of the statute is likewise satisfied only where one is "regarded as precluded from more than a particular job."[4]  *Adams*, 531

---

[3] The Rehabilitation Act incorporates the definition of "disability" from the Americans with Disabilities Act ("ADA").  *See* 29 U.S.C. § 705(20)(B) (cross-referencing 42 U.S.C. § 12102); *see also* 29 U.S.C. § 791(f) (incorporating ADA standards); 29 C.F.R. § 1614.203(b).

[4] Congress amended the ADA, effective January 1, 2009, to broaden the definition of a disability.  *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008).  The amendments retained § 12102(1) but

F.3d at 945 (quoting *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523 (1999)).

**B.**

Upon review of the record, we find that Nurriddin essentially "plead[ed] himself out of court by alleging facts that render success on the merits impossible." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (citing *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000)). He did not allege that he is substantially limited in working, which requires inability to perform a broad range of jobs. *See Duncan*, 240 F.3d at 1114. In his complaint, Nurriddin explains that his "medical conditions [major depression and back pain] were the result of continued and relentless harassment by management officials in the Education Division." J.A. 33 (¶ 23) (alteration in original). His factual allegations, however, give rise to an inference that his impairment related only to his particular job. *See, e.g.*, J.A. 44 (¶ 93) (describing his success working for the National Science Foundation). Moreover, Nurriddin directly concedes that despite this condition, he "was able to perform some of the positions within NASA." J.A. 53-54 (¶¶ 167, 176).

For similar reasons, the District Court properly dismissed Nurriddin's claim that NASA regarded him as having a disability. Nurriddin offers a conclusory allegation that "[a]t all times since August 5, 1998," he "has been responded to

clarified in paragraph three of that section that an individual is protected from adverse action taken by an employer "because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis added). These amendments are not retroactive and do not affect our case. *See Lytes v. D.C. Water & Sewer Auth.*, 572 F.3d 936, 938 (D.C. Cir. 2009).

[by NASA] as an individual . . . perceived to have a disability." J.A. 52 (¶ 163); *see also* J.A. 53 (¶ 172). At other parts of the complaint, though, he provides facts that indicate NASA perceived him as being capable of working outside of his division. J.A. 45 (¶ 99) (medical letter presented to NASA that Nurriddin could "transfer to a less stressful work site"); J.A. 45 (¶ 102) (NASA email characterizing Nurriddin's actions as targeting one division – "resist[ing] working in [the Education Division] in any way he can"); J.A. 47 (¶ 119) (NASA email suggesting the agency did not believe Nurriddin had a disability, and had no "compelling reason for further accommodations, medical or otherwise"); J.A. 49 (¶ 132) (NASA email mentioning detail to a different office as a "strong possibility"); J.A.49 (¶ 133) (NASA email rejecting a detail as inappropriate not because of Nurriddin's disability, but because it "does nothing positive for us except delay whatever will happen").

These facts do not give rise to an inference that NASA regarded Nurriddin as unable to perform a broad range of jobs. Without a disability within the meaning of the statute, or NASA regarding him as so impaired, Nurriddin's claim of discrimination in violation of the Rehabilitation Act fails.[5]

---

[5] The District Court apparently dismissed Nurriddin's claim of retaliation under the Rehabilitation Act because it determined that he could not meet the statutory definition of a disability. *See Nurriddin III*, 674 F. Supp. 2d at 85. Because Nurriddin has not challenged this ruling on appeal, we do not reach it, but we note that under Title VII, an employee's retaliation claim does not rise or fall on the success of her underlying, good-faith discrimination claim, s*ee Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 24 (D.C. Cir. 2013), *cert. denied*, 134 S. Ct. 899 (2014), and our sister circuits overwhelmingly agree the same is true in the disability rights context, *see Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007) ("A plaintiff may prevail on a disability-retaliation claim even if the underlying claim of disability fails." (quotation marks omitted)); *Cassimy v. Bd. of Educ.*, 461 F.3d 932, 938 (7th Cir. 2006); *Coons v. Sec'y*

**III.**

We move on to Nurriddin's Title VII claims. We review the District Court's grant of summary judgment to the agency *de novo*. *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010). Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *Id.* A dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *George*, 407 F.3d at 410 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In making this determination, we view all of the evidence in the light most favorable to the nonmoving party. *Id*.

**A.**

A plaintiff may prove her Title VII discrimination or retaliation claim with direct evidence, for example through a statement that itself shows racial bias in the employment decision. *See Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). Alternatively, a plaintiff may base her claim on circumstantial evidence under the familiar *McDonnell Douglas* burden-shifting framework. *See George*, 407 F.3d at 411; *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). After the plaintiff makes out her prima facie

---

*of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004); *Heisler v. Metro. Council*, 339 F.3d 622, 632 (8th Cir. 2003) (citing *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 786 (3d Cir. 1998)); *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998); *Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 16 (1st Cir. 1997).

case,[6] the employer must articulate a legitimate, nondiscriminatory reason for its actions, after which the plaintiff has an opportunity to show the employer's stated reason was pretextual. *See George*, 407 F.3d at 411.

At the summary judgment stage, once the employer has claimed a nondiscriminatory reason for its actions, this burden-shifting framework disappears. *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). We no longer consider whether the plaintiff properly made out her prima facie case. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (describing the prima facie burden at this point as a "largely unnecessary sideshow"). The "one central inquiry" that remains is whether a reasonable jury could infer retaliation or discrimination from all the evidence. *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012); *see also Jones*, 557 F.3d at 677. We evaluate this question "in light of the total circumstances of the case," asking "whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Hamilton*, 666 F.3d at 1351 (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289, 1291 (D.C. Cir.

---

[6] A plaintiff establishes a prima facie case of discrimination by showing that she: 1) is a member of a protected class; 2) suffered an adverse employment action; and that 3) the unfavorable action gives rise to an inference of discrimination. *George*, 407 F.3d at 412. A prima facie case of retaliation requires that a plaintiff demonstrate she: 1) engaged in a statutorily protected activity; 2) suffered a materially adverse action by her employer; and that 3) a causal connection existed between the two. *Wiley*, 511 F.3d at 155.

1998) (en banc)); *see also Pardo-Kronemann*, 601 F.3d at 604.

The District Court granted summary judgment to NASA on Nurriddin's Title VII discrimination and retaliation claims, which, as discussed above, were based on eight events: 1) denial of a noncompetitive promotion in 1998; 2) an $800 performance award in 1998; 3) denial of two travel requests in 1998 (retaliation claim only); 4) denial of a performance award in 1999; 5) designation as AWOL for 59 days in 2000; 6) denial of donated leave after 2000, 7) denial of a WGI before 2001, and; 8) termination in 2004.

We can affirm the District Court on several of these claims at the outset. Nurriddin simply offers conclusory statements, with little citation to the record, in order to rebut NASA's proffered legitimate reasons for denying two travel requests in 1998, designating him as AWOL in 2000, and awarding his WGI in 2001 rather than in 2000. Furthermore, there is no evidence that NASA denied him donated leave in 2000. Even assuming all of these discrete events are actionable, there is no basis whatsoever for a reasonable jury to infer either discrimination or retaliation.

Nurriddin does not fare much better with regard to his claims based on 1) denial of a noncompetitive promotion in 1998; 2) an $800 performance award in 1998; 3) denial of a performance award in 1999, or; 4) his termination in 2004. Still, we consider these claims in more detail as follows.

**B.**

Nurriddin argues that he was denied a promotion in 1998 as a result of discriminatory and retaliatory animus. The District Court granted summary judgment to NASA, in part because the white co-worker Nurriddin offered as an alleged

comparator was not sufficiently similarly situated. *Nurriddin IV*, 40 F. Supp. 3d at 121. Nurriddin claims this was in error, and also spills much ink criticizing the District Court's alleged reliance on whether he made out a prima facie case.

We note that it is unclear whether the District Court believed that a plaintiff must demonstrate that a "similarly situated" employee outside of her protected class received a promotion as part of her prima facie case. *See id.* at 120 (citing *Taylor v. Small*, 350 F.3d 1286, 1294 (D.C. Cir. 2003)). Such a showing is not required. *See Stella v. Mineta*, 284 F.3d 135, 146 (D.C. Cir. 2002) (recognizing that prior decisions "created confusion on this point"); *see also Brady,* 520 F.3d at 494 n.2 ("[T]o make out a prima facie case, a plaintiff need not demonstrate that he or she was treated differently from a similarly situated employee or that the position was filled by a person outside the plaintiff's group."); *Wiley*, 511 F.3d at 156.

In any case, the issue before us is not Nurriddin's prima facie burden. And we disagree with Nurriddin that the District Court fundamentally erred in its discussion of the prima facie case at the summary judgment stage. The court was explicit that it was analyzing "the prima facie case not to evade[ ] the ultimate question of discrimination vel non, but rather because [the plaintiff's] prima facie case is part of the evidence [the Court] must consider in addressing that question." *Nurriddin IV*, 40 F. Supp. 3d at 120 (quotation marks omitted) (alterations in original); *see also id.* at 118 (citing *Brady*, 520 F.3d at 494). Some portions of the District Court's opinion are admittedly in tension with this correct statement of the law. *See, e.g.*, *id.* at 118 (reconsidering whether "Nurriddin meets his burden under the *McDonnell Douglas* framework"); *id.* at 127 ("Nurriddin fails to make out a prima facie case."). Ultimately, though, the court

articulated the correct legal standard, and we review its decision *de novo* in any event.

All this said, Nurriddin has not established that he was denied a promotion as a result of illegal discrimination or retaliation. He seems to argue generally that he was due for an accretion of duty promotion. Such promotion opportunities arise where the "position is reclassified at a higher grade because the duties and responsibilities of the position have increased over a period of time." *See Wiley*, 511 F.3d at 156 (quotation marks omitted). But Nurriddin nowhere explains this process, why it applies to his position, what his original duties were, or how they had evolved by the time he was denied a promotion. Without any evidence that "the duties and responsibilities of [his] job had increased so as to warrant an accretion of duty promotion," he fails to demonstrate the lack of promotion was either a pretext for discrimination or retaliation. *Id.* at 157.

## C.

Next, Nurriddin claims NASA discriminated and retaliated against him when it awarded him a "mere $800 performance award in 1998." Apparently Nurriddin first claimed that he was denied a performance award in 1998 for the 1997-1998 period, after which NASA responded that he in fact received an $800 award. *Nurriddin IV*, 40 F. Supp. 3d. at 124. In his opposition to NASA's motion for summary judgment, he then conceded that he received $800, but that "only an $800 performance award" was nonetheless discrimination and retaliation. *Id.* In support of this argument, Nurriddin presents what he believes to be two pieces of direct evidence of animus: 1) Nurriddin's statement that a co-worker told him that Phelps said Nurriddin's performance evaluation would be lowered because of his

work as a minority advocate; and 2) Nurriddin's statement that Phelps said Nurriddin's EEO complaints were a "crock of s-h-i-t."

Even though denial of a discretionary bonus is an actionable adverse employment action, *see Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009), Nurriddin does not succeed in rebutting the agency's explanation. NASA's proffered legitimate reason for the award is that Nurriddin's performance did not merit a higher one. Indeed, Nurriddin received $800 despite the fact that his review for the same time period noted "a pattern of missed deadlines and unresponsiveness to his management."

When it comes to retaliation, Nurriddin offers no evidence supporting a causal connection between any protected activity and the $800 award. Nurriddin's contention that a co-worker told him that Phelps said he was going to lower Nurriddin's evaluation is inadmissible double hearsay. *See Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) ("[T]he evidence still must be capable of being converted into admissible evidence."). Furthermore, Nurriddin offered absolutely no evidence to the district court about when Phelps' alleged "crock of s-h-i-t" comments occurred. *See Nurriddin IV*, 40 F. Supp. 3d at 124 ("[N]either in his deposition nor in his brief does Nurriddin provide a date when this alleged statement was made."). Even assuming this confrontation happened on October 1, 1998, as Nurriddin attempts to convince us on appeal, this would have been after both receipt of the award on August 17, 1998, and his filing of a September 9, 1998 EEO complaint. His retaliation claim therefore fails for lack of any causal connection.

## D.

We move on to 1999. Nurriddin did not receive any performance award, and thinks he should have. NASA explains the lack of an award because he had been on leave a significant part of the time from August 1998 through January 1999, and then went on detail to NSF in February 1999 for a year. Nurriddin claims he presented the District Court with evidence that this explanation is pretext, including evidence that: 1) awards were given to several of his coworkers; 2) NASA meant to condition his detail assignment on the "resolution" of his EEO complaints, as shown in a November 3, 1998 email and; 3) the high quality of his work while on detail.

Despite his allegations, Nurriddin cannot point to any evidence of discrimination. The best evidence demonstrating unequal treatment would be a comparison. 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 73 (4th ed. 2007) ("In most cases the key to proving pretext is comparative evidence."). Here, that would be another employee assigned to detail that NASA treated more favorably than Nuriddin. But Nurriddin has provided no evidence of such an employee. In fact, Nurriddin has not provided any evidence that would undermine NASA's about conferring discretionary awards to employees assigned on detail.

Our dissenting colleague quibbles with NASA's proffered justification for not rewarding Nurriddin for satisfactory performance while away on detail. The best the dissent can do is point to a constellation of facts that indicate Nuriddin's time at NSF may have warranted an award and that NASA had the discretionary authority to reward Nurridin—even if NSF declined to do so. But again, that is not evidence

suggesting NASA's stated reasons are pretextual. Instead, the record makes clear that performance awards are discretionary. NSF, despite an otherwise positive evaluation letter, chose not to reward Nurriddin's performance during his detail. NASA declined to reward Nurriddin's performance because, in management's estimation, Nurriddin's performance did not merit reward. Without evidence that a similarly situated employee received special recognition denied to Nurriddin, or evidence NASA is "lying about the underlying facts that formed the predicate" for their decision not to confer a performance award, *Brady*, 520 F.3d at 495, we cannot conclude that NASA's decision to withhold his discretionary award was discriminatory.

## E.

Nurriddin lastly claims that he was wrongfully terminated in 2004 as a result of both discrimination and retaliation. To conclude the saga, we remind the reader that Nurriddin had last attended work in the spring of 2000. After yet another job search in October 2003 did not return any vacant positions, Houston proposed removing Nurriddin. Diaz made the final decision to terminate, effective February 2004, based on Nurriddin's medical inability to perform his duties. Houston, who replaced Phelps as Nurriddin's supervisor, joined the agency in February 2003 and had never met Nurriddin before then. Diaz had been on detail to an external office since 1998, and only returned to the Education Division as Nurriddin's third-level supervisor in October 2003.

Nonetheless, Nurriddin offers us a conspiracy theory dating back to 2001. He points to an email from September 18, 2001, where Human Resources used the words, "tactical ploy," to describe a potential course of action: offering Nurriddin a position with a different first-level supervisor

that, if he did not accept, would foreclose his OWCP claim. As it turned out, OWCP did not require Nurriddin to accept that job offer, because even though the agency offered to switch his first-level supervisor, Nurriddin had also named that individual in his numerous EEO complaints over the years. Nurriddin explains that if the 2001 job offer had been extended in good faith, he would have returned to work at that time, meaning he would not have suffered a gap in employment, and Diaz would have had no reason to terminate him in 2004.

Nurriddin's evidence is insufficient to prove any pretext on the part of NASA. Nurriddin had left the office back in 2000. By 2004, he had been assigned new supervisors. Houston and Diaz had no involvement in his long dispute with previous management. As Houston described, NASA was implementing new initiatives that required gearing up its educational programs. The agency needed to free up Nurriddin's position to meet this need. The 2001 email, written by different individuals three years prior, simply does not give rise to an inference that Nurriddin was terminated on the basis of discrimination. *See Vickers v. Powell*, 493 F.3d 186, 196 (D.C. Cir. 2007) (describing a subordinate's bias as irrelevant where the ultimate decision maker is not influenced by the subordinate).

Nurriddin's reliance on the September 2001 email as evidence of retaliatory termination is similarly unconvincing. Nurriddin ignores the fact that, to succeed on this claim, he must connect the termination decision to some activity protected under the statute. Even considering that he named a human resources official and Office of General Counsel attorney – Dorothy Egbert and Mark Batkin – in a January 2002 EEO complaint, his termination occurred more than two years later in February 2004. *See Payne v. D.C. Gov't*, 722

F.3d 345, 354 (D.C. Cir. 2013) (rejecting, without any further evidence, an eight-month gap between the protected activity and alleged retaliation as proof of a causal connection).  Diaz of course made the decision to terminate in consultation with human resources and agency counsel.  But that alone does not suffice to show that a retaliatory reason more likely than not motivated NASA's decision to terminate Nurriddin.

**\*\*\***

Nurriddin's lengthy dispute with NASA thus comes to a close.  The District Court did not err in dismissing Nurriddin's claims under the Rehabilitation Act, and properly granted summary judgment to the agency on his Title VII claims.

Our employment discrimination laws are meant to protect against more than just decisions an employee believes to be unfair.  *See Patterson v. Johnson*, 505 F.3d 1296, 1301 (D.C. Cir. 2007).  For the foregoing reasons, we affirm the District Court's judgment in its entirety.

*So ordered.*

WILKINS, *Circuit Judge*, dissenting in part:

While I join the bulk of the Court's opinion, I must part ways with my colleagues on Nurriddin's Title VII claims related to NASA's decision not to give him a performance award in 1999. I believe a reasonable jury could infer this decision was motivated by unlawful discrimination or retaliation.

The "'central question' at summary judgment becomes whether 'the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee.'" *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (brackets omitted)).

I disagree with the majority that Nurriddin needs to point to a comparator to survive summary judgment. *See* Maj. Op. 18 (objecting that Nurriddin has provided "no evidence" of an employee treated more favorably than him). Nurriddin certainly is not required to come forth with evidence that NASA treated similarly situated employees more favorably. While that is one potential avenue, he can also support an inference of discrimination by exposing NASA's explanation as "inconsistent or dishonest." *Walker*, 798 F.3d at 1092; *see also Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008) ("Alternatively, the employee may attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision."). He has done so here.

NASA's proffered legitimate reason for not giving a 1999 bonus is that Nurriddin worked elsewhere during that time. According to a 2001 affidavit from Malcolm Phelps,

Nurriddin's first-level supervisor, no award was given "because [Nurriddin] had not worked in the office for the entire year." Also in a 2001 affidavit, alternate first-level supervisor Sherri McGee explained that "in management's estimation, there was no 'performance' that justified an award." NASA contends that it was up to the detail agency, the National Science Foundation ("NSF"), to provide the bonus.

NASA's proffered reason is flatly contradicted elsewhere in the record. Deposition testimony by human resources official Inez Hunter reveals that if a detail office was not willing to fund a bonus, NASA could still fund it – at management's discretion. "[I]f the work was actually outstanding," explained Hunter, ". . . what the [employee] would get, that would be management's discretion." When asked if an employee's detail was a valid reason to deny a performance award, Hunter answered, "no."

NASA does not engage with this contradiction but instead simply maintains that Nurriddin's detail office "did not fund" an award. For support, the agency cites to an evaluation letter from the NSF. The letter is entirely glowing of Nurriddin's performance but does not say one way or another whether the NSF provided money for an award. The only conclusion this letter supports is that Nurriddin's work on detail "was actually outstanding."

Viewing the evidence in the light most favorable to Nurriddin, his supervisors gave reasons for not providing a bonus that a reasonable jury could find false. *See Walker*, 798 F.3d at 1092 ("A plaintiff may support an inference that the employer's stated reasons were pretextual . . . by citing the employer's . . . inconsistent or dishonest explanations . . . or other relevant evidence that a jury could reasonably conclude

evinces an illicit motive."). Human Resources contends Phelps and McGee *did* have the discretion to give Nurriddin an award. The District Court confirmed that "other NASA managers received performance awards while on detail." *Nurriddin IV*, 40 F. Supp. 3d. at 127. Furthermore, the agency was caught in a November 1998 email chain discussing Nurriddin's placement options on detail in terms of "conditions such as resolution of the EEO complaints," after which Nurriddin filed another EEO complaint naming Phelps and McGee as responsible management officials in January of 1999. All of this evidence combined gives rise to an inference that Nurriddin did not receive a bonus on account of unlawful discrimination or retaliation.

When considering the evidence in the light most favorable to Nurriddin, as we must, I do not believe that NASA has met its burden of proving "that there is no genuine dispute as to any material fact" regarding whether it was up to the detail agency to award a bonus, *see* Fed. R. Civ. P. 56(a), and I would reverse the District Court on these discrimination and retaliation claims alone.